IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

        vs.                         Case No. 09-10099-06-JTM

WILLIAM SCOTT,

        Defendant.

MEMORANDUM AND ORDER

Defendant William Scott has presented three motions to the court – for discovery, severance, and suppression. The court heard argument and evidence on these motions on July 12, 2010. At the conclusion of that hearing, the court granted the motion for discovery, and denied the remaining motions. In addition to the findings of the court made during and at the conclusion of that hearing, the court enters the following findings of fact and conclusions of law.
.

**1. Motion for Discovery**

Defendant Scott filed a Motion for Discovery Pursuant to Rule 16 and Production of Exculpatory and Impeachment Evidence Pursuant to *Brady* on June 8, 2010. In it, Scott asks the Court to force the government to comply with Rule 16 and *Brady* by handing over several pieces

of evidence including reports, surveillance tapes, and by giving Scott an opportunity to inspect any items, buildings, or places material to his defense. However, on March 29, 2010, the Court had already entered a General Order of Discovery and Scheduling meant, in part, to reduce or eliminate the filing of "boilerplate" discovery motions such as this one. The Court's General Order specifically requires the government to comply with Rule 16 and *Brady* within 30 days of the arraignment, making Scott's motion redundant.

Furthermore, it appears that the government has already complied with the Court's General Order by turning over evidence under its control and making physical evidence available for inspection. Finally, the government has expressed a willingness to continue to comply by turning over evidence as it is discovered or as its materiality to Scott's defense becomes clear.

The court therefore grants the Motion for Discovery, while also finding that the government has complied with its obligation to provide such discovery.

**2. Motion for Severance**

*Findings of Fact*

Defendant Scott and six other individuals were indicted on August 18, 2009. The Indictment is a result of an investigation by the DEA that included wiretapping Defendants Bernard Redd and Adrian Patterson, as well as surveillance and searches. It is alleged that Redd was supplying illicit drugs to Buchanan and Patterson, who in turn were supplying these drugs to others, including Scott and Buffington. Scott is charged with conspiring to distribute or possess with intent to distribute

crack cocaine and possession of crack cocaine with intent to distribute in counts four and six respectively. Also charged in these counts are Defendants Buffington and Patterson. There are eighteen other counts in the indictment, none of which name Scott as a defendant. The events leading to the indictment occurred during a time span of roughly four and a half months, but Scott's charges arise from events that took place in a single day.

*Conclusions of Law*

Rule 8(b) of the Federal Rules of Criminal Procedure provides that "the indictment...may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Additionally, "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States,* 506 U.S. 534, 537 (1993). When determining whether joinder is proper, the court must consider the facts and circumstances of each case. See *United States v. Bailey*, 952 F.2d 363, 365 (1991). This decision is "within the sound discretion of the trial court." *Id.*

Rule 14 of the Federal Rules of Criminal Procedure allows for the severance of properly joined defendants when joinder would be prejudicial to a particular defendant. Even if prejudice is shown, Rule 14 does not necessarily require severance. *See Zafiro*, 506 U.S. at 538-39. Prejudice is only severe enough to sever a trial when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. If the Court finds that prejudice would be present,

it "may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

Scott argues first that joinder of him and his six co-defendants was improper under the Federal Rules of Criminal Procedure 8(b), second that joinder will not serve the purpose behind rule 8(b), and finally that even if joinder was proper, severance is appropriate under rule 14(a).

"The test for a proper joinder is a common thread to each of the defendants." *United States v. Rogers*, 921 F.2d 975, 984 (10th Cir. 1990). "This link between joined defendants may be established by common evidence as to various counts." *Id.* However, "the defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count." Fed. R. Crim. P. 8(a).

Here, Scott argues that there is no common thread between him and his co-defendants. Scott is one of seven Defendants, but is only charged in two of twenty counts and only along with two co-defendants (Buffington and Patterson). However, the charges against all Defendants stem from an alleged drug distribution network that each Defendant, including Scott, supposedly had a part in perpetuating. Scott attempts to distance himself in a number of ways. He points out that his alleged criminal activity takes place on a single day, whereas the indictment covers a period of four and a half months. He also asserts that he is discussed only four times in over 6,000 wiretap sound files gathered by the government and that his name is never mentioned in any Grand Jury testimony.

However, it appears that Scott's name is mentioned in Grand Jury testimony that has not yet been produced and that the same evidence will be used against Scott and his co-defendants. Furthermore, of the over 6,000 wiretap files recorded, only 364 are labeled pertinent to the Indictment. Additionally, it is difficult to see the relevance of the ratio of Scott's calls to the total

4

number of calls. The content of those calls, rather than the quantity, would be the more pertinent factor in determining whether a common thread exists between the defendants. Scott has not alleged any facts that would sever the common thread of criminal conduct that connects him to the other Defendants. His charges arise from the same drug distribution scheme that forms the basis for all other counts in the indictment. Hence, joinder was proper.

Scott's second argument in support of his motion is that holding one trial will not support efficiency or help to avoid inconsistent verdicts. Scott asserts again that the evidence behind the two counts against him will be completely different from the evidence behind the other eighteen counts, making it inefficient to hold one long, complex trial rather than two. He also argues two trials will present little risk of inconsistent judgments because the evidence presented in the trials would be different. However, it is alleged that there was a direct line of drug distribution from Redd through Patterson and finally to Scott and Buffington. Furthermore, the government alleges that surveillance and wiretaps provide evidence against all these Defendants. The judicial preference for joint trials for defendants indicted together overcomes Scott's speculation about the inefficiency of holding a single trial here.

Scott's final argument is that he will be unduly prejudiced if his case is not severed. His sole concern is that jurors will be so focused on the complex, interstate drug distribution scheme that is the subject of much of the indictment that they will inadvertently impute this conduct to Scott, who allegedly to have committed just a single drug transaction. However, the Tenth Circuit has previously ruled that "neither a mere allegation that defendant would have a better chance of acquittal in a separate trial ... nor a complaint of the 'spillover effect' from the evidence that was

5

overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance." *United States v. Hack*, 782 F.2d 862 (1986).

If prejudice becomes apparent, the court is not limited in its remedies to severance. *See Zafiro*, 506 U.S. at 539. "Less dramatic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* Scott's argument essentially is a complaint about the spillover effect of evidence he anticipates to be directed at his co-defendants. However, this will not prejudice Scott to such a degree that severance is necessary. If prejudice becomes apparent, the Court will be able to cure such prejudice with limiting instructions or other appropriate measures. Thus, a joint trial for all defendants would not compromise any of Scott's trial rights nor would it prevent the jury from making reliable judgments regarding the defendants.

In sum, the court finds that severance of the charges against Scott is not warranted. Instead, the court will issue careful and appropriate cautionary instructions that the jury must consider each of the defendants individually, assess the evidence as to each independently, and draw no inferences merely based on the number of defendants or charges.

**3. Motion to Suppress**

*Findings of Fact*

On March 31, 2009, the DEA intercepted four phone calls between Defendants Scott and Patterson. The intercepts occurred in connection with the DEA's continuing investigation of drug

6

trafficking in Wichita, Kansas. Detective and DEA Task Force Agent Eric Smith testified that, based on three months of listening to conversations of telephone calls made to and from telephones linked to defendants Bernard Redd and Adrian Patterson, both men were involved in the drug trade.

Detective Smith had not previously heard Scott's name arise in the investigation. In the March 31st calls, Scott said he was trying to get some "grapes" from Patterson, and Patterson instructed Scott to meet him at a QuikTrip on the corner of West Street and 13th Street.

Officer Lance Oldridge surveilled the QuikTrip, where the saw a dark blue Tahoe SUV enter the parking lot. No one emerged from the Tahoe, which eventually left the parking lot, and circled the neighborhood. In the meantime, a red Dodge Charger entered the lot. Although it parked next to one of the convenience store's gas pumps, no one got out of the car. The Tahoe then returned to the parking lot. Scott got out of the Tahoe, which was driven by defendant Buffington, and entered the Charger. According to Oldridge, Scott emerged from the Charger and returned to the Tahoe after "no more than a minute, probably less."

Oldridge then followed the Tahoe, and observed it running a red light, cutting across a lane of traffic to turn onto the limited access I-235. Because he was not in immediate position to follow the car, and in order to conceal the ongoing surveillance, Oldridge asked that another officer stop the Tahoe for the traffic infraction.

Wichita Police Officer Latavia Klumpp stopped the Tahoe, and told the driver Buffington, that he had run a red light. She testified that both Buffington and Scott appeared relaxed. Scott told Klumpp he wasn't wearing his seat belt and would take his ticket for that. Klumpp, who had by then been joined by another officer, told Scott that he should tell the other officer, who had approached the passenger side of the Tahoe.

7

Klumpp told Buffington to sit tight while she ran Buffington and Scott's names for warrants. She found none, but spoke with Detective Smith over the phone. Smith told Klumpp to try and obtain consent for a search. Klumpp wrote out the citation. Due to high winds, she asked Buffington to step out of the Tahoe and come back to rear. For officer safety reasons, she patted him down and then gave him the citation and his license. She then asked for consent to search.

Buffington said no, that he had gotten in trouble previously before for having marijuana in his vehicle after loaning it to someone else.

The police canine unit (which had been previously directed to the stop) arrived shortly afterwards. The traffic stop was the same in length as any other, up to the time of the consent request (about five to seven minutes). Detective Martin arrived with a drug sniffing dog, which alerted on the interior of the car, and a hand search by an officer uncovered some crack cocaine inside a CD case. Both Scott and Buffington were placed under arrest. More drugs were later found in the booking area of the jail, which the Government believes were abandoned by Scott and Buffington.

*Conclusions of Law*

Scott contends that the officers performed a warrantless search on the blue Tahoe in violation of the Fourth Amendment. Scott argues that no probable cause existed at any time prior to the search, and thus the evidence uncovered by the search should be excluded from this case.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are per se unreasonable, unless they fall under one of the few "Specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is the "automobile exception," under which "police officers who have

8

probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant." *Florida v. Meyers*, 466 U.S. 380, 381 (1984).

The government contends that the traffic stop was justified on two different theories. First, the government argues that the police had probable cause to believe Scott and Buffington were engaged in narcotics trafficking, based on what occurred at the QuikTrip. Second, the government argues that, even if the police did not have probable cause prior to the traffic stop, the car was legitimately stopped for a traffic infraction, and the officers had reasonable suspicion justifying the use of the drug dog.

"Probable cause to arrest exists when an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed." *United States v. Guerrero-Hernandez*, 95 F.3d 983, 986 (10th Cir. 1996). "Probable cause to arrest does not require facts sufficient to establish guilt, but does require more than mere suspicion." *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998).

In the present case, probable cause that Scott had engaged in an illicit drug transaction and that drugs would be found in the car existed based on the following circumstances: (1) The DEA had intercepted four different calls between Scott and Patterson that led to a meeting at a QuikTrip, the purpose of which Scott claimed on the phone was to purchase some "grapes" from Patterson; (2) each of these four calls occurred on the same day Scott was stopped by police and eventually arrested; (3) the information in the phone calls intercepted by the DEA was corroborated by the fact that Patterson, Scott, and Buffington actually did meet at a QuikTrip on West and 13th; (4) the conduct of the vehicles at the QuikTrip – with the movements of the vehicles, the failure of any

9

occupants to either enter the store or use the gas pumps, and Scott entering the Charger for less than a minute – all supporting an inference that an illicit drug transaction was taking place, (5) the fact that the two met at a QuikTrip so that Scott could purchase some "grapes" is itself suspicious, as QuikTrip is a store not known for its produce, and (6) that the parties did not simply meet at Patterson's house, which was less than a mile from the QuikTrip. Because the officers had probable cause to believe contraband was inside the vehicle in which Scott was riding, the warrantless search was justified under the automobile exception.

The government argues alternatively that even if probable cause to arrest was not present, the traffic stop was lawful under the principles of *Terry v. Ohio,* 392 U.S. 1, 20 (1968). Under *Terry*, a traffic stop is reasonable if "the officer's action was justified at its inception, and [if] it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* The government maintains that the stop was justified by a traffic infraction, and because it lasted just long enough for the officer to speak to Scott and Buffington, run a records check on them, issue the citation, and explain the citation.

Officer Klummp may have extended the length of the stop slightly by asking Scott if there were any illegal items in the car and if Scott would consent to a search, but mere questioning by police does not violate the Fourth Amendment, as long as "it does not extend the stop 'beyond the time reasonably required to complete [it].'" *U.S. v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Because they were asked as Officer Klummp was explaining the citation to Scott, it does not appear that these questions extended the stop unreasonably, if at all.

Under the facts presented, it does not appear that the dog alerted to the outside of the vehicle. Further, it is not clear whether the dog's entrance into the car was facilitated by the police or whether it entered on its own accord. Finally, it is not clear precisely what delay, if any, there was between the time the traffic stop concluded and Detective Martin arrived with the drug dog, although it does not appear to have been more than a few minutes.

Once Detective Martin arrived with a drug-sniffing dog and proceeded to require Scott and Buffington to wait as the dog sniffed the car, Scott and Buffington were certainly detained beyond the time needed for the initial traffic stop. Suspects may be detained for questioning after an initial traffic stop if (1) the officer "has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring," or (2) "if the initial detention has become a consensual encounter." *United States v. Hunnicut*, 135 F.3d 1345, 1349 (10th Cir. 1998).

Generally, the use of a drug-sniffing dog is "not a 'search' within the meaning of the fourth amendment, and therefore ... reasonable suspicion of drug-related criminal activity is not required when the dog sniff is employed during a lawful seizure of [a] vehicle." *United States v. Morales-Zamora*, 914 F.2d 200, 203 (10th Cir. 1990). However, reasonable suspicion is required to briefly detain a vehicle, previously stopped for a traffic violation, to permit the use of a drug-sniffing dog. *See United States v. Williams*, 271 F.3d 1262, 1271 (10th Cir. 2001). In addition, it is notable that the dog here apparently did not alert on the outside of the car, but did alert on the interior of the car. It appears, however, that the same standard – reasonable suspicion – applies to both the use of a canine to smell a vehicle's interior as well as for a brief, post-citation detention of a vehicle. *See United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998) (suppressing evidence obtained following canine sniff of the interior of a car in the absence of reasonable suspicion).

Once a trained drug-sniffing dog alerts on a vehicle, indicating the presence of illicit drugs, probable cause then exists to search the vehicle. *See United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009). Here, the narcotics were concealed in a CD case, which Detective Martin lawfully opened and searched, because "if probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982).

Here, even the facts discussed in the previous section did not amount to probable cause, those same facts (the wiretapped conversation, and the corroborating evidence from the surveillance conducted at the QuikTrip) produced information from which officers could reasonably suspect that the Tahoe was involved in drug trafficking. Accordingly, the search – both the brief additional detention of the vehicle and the use of the drug dog in the interior of the car – was justified.

IT IS ACCORDINGLY ORDERED this 27th day of July, that the defendant's Motion for Discovery (Dkt. 71) is granted; his Motions to Sever (Dkt. 73) and to Suppress (Dkt. 69) are denied.

    s/ J. Thomas Marten  
    J. THOMAS MARTEN, JUDGE